UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Nadine Hatten,

    Plaintiff,

v.

Experian Information Solutions, Inc., a
foreign corporation, and PNC Bank National
Association, a national banking association,
jointly and severally,

    Defendants.
    _____/

Case No. 12-12236

Honorable Nancy G. Edmunds

**ORDER GRANTING DEFENDANT PNC'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. 36 & 37]**

Currently before the court are motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. The motions are made by both Plaintiff Nadine Hatten ("Plaintiff") and Defendnat PNC Bank, N.A. ("PNC" or "the bank"). For the reasons set forth below, the Court GRANTS PNC's motion, DENIES Plaintiff's motion and DISMISSES all remaining claims.

**I.    FACTS**

On May 22, 2012, Plaintiff brought the instant lawsuit against Experian Information Solutions and PNC Bank, jointly and severally, for alleged willful and negligent violations of the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681 *et seq.* On October 25, 2012, Experian was dismissed from the case, leaving PNC Bank as the only defendant. [Dkt. 16].

The undisputed facts of this case are as follows. In January 2004, Plaintiff purchased a home with a loan from National City Bank, secured by a mortgage. Pl.'s Mot. Summ. J.

at 2. Plaintiff defaulted on her loan, and National City foreclosed on the mortgage in 2007. *Id.* PNC subsequently acquired National City Bank, and became the custodian of the records pertaining to Plaintiff's mortgage and foreclosure. *Id.* Under current industry practices, foreclosures remain on a credit report as an adverse item for seven years from the date of foreclosure.

In 2009 Plaintiff discovered that her credit report incorrectly indicated that her foreclosure occurred in July 2009, instead of December 2007. *Id.* Plaintiff complained to Experian and contacted National City directly. *Id.* On June 22, 2009, National City sent a letter to Plaintiff apologizing for any inconvenience and stating that National City requested that the consumer reporting agencies correct the foreclosure date. Pl.'s Mot. Summ. J., Ex. 1. The record reflects that approximately one month later, on or about July 28, 2009, Experian issued a credit report to Plaintiff, and that the report still contained the erroneous information. PNC Mot. Summ. J., Ex. M. Plaintiff did nothing about the persisting discrepancy.

The record shows that in August 2010, once again it came to Plaintiff's attention that Experian was still incorrectly reporting the date of her foreclosure; Plaintiff, however, did not lodge a complaint with Experian about the continuing problem until January 2011. Hatten Dep. 29:22-30:19, 34:22-35:19. In 2012 Plaintiff discovered that the problem was still not fixed, and in May 2012, Plaintiff's attorney sent another notice to Experian. *Id.* at 39:6-40:12. In both instances, upon receipt of Plaintiff's complaint, Experian sent a standardized notice, known as an ACVD, to PNC in an attempt to confirm the date of Plaintiff's foreclosure. Pl.'s Mot. Summ. J. at 3. Neither ACVD made note of the fact that this was an ongoing problem. Pl.'s Mot. Summ. J., Ex. 6 & 10. Experian's attempts to verify

the date of the foreclosure, both in 2011 and 2012 were met with the same statement from PNC, that the "Account Information [is] Accurate as of Date Reported." Pl.'s Mot. Summ. J. at 3. Experian accepted PNC's responses as accurate and continued to reflect the wrong date of foreclosure on Plaintiff's credit report. *Id.*

Two PNC employees, including Kimberly Hairston, the employee that handled Plaintiff's complaints in 2011 and 2102, gave deposition testimony about PNC's document retention system and consumer dispute policies generally, and with regard to this case in particular. According to the PNC employees, for a period of time the bank retains records electronically in a "purged records system." Pl.'s Mot. Summ, J., Ex. 16, Hargrove Dep., May 17, 2013, 28:7-30:5. During the time Plaintiff was contesting her credit report, her records at PNC would have been in the electronic purged records system. *Id.*

Ms. Hairston testified that her responses to the two complaint notices from Experian were based solely on a note from PNC's foreclosure department found in the purged records system. Pl.'s Mot. Summ. J., Ex. 15, Hairston Dep., April 29, 2013, 17:2-19:2. That note was incorrect, and no explanation for that error has been offered. Ms. Hairston had the ability to more thoroughly check Plaintiff's file on the purged records system, but did not, and testified that she had no reason to, given the note from the foreclosure department. *Id.* A thorough check of the purged record system would likely have revealed the foreclosure department's error. Hargrove Dep. 29:10-30:5. Plaintiff's two complaints were separated by approximately eighteen months, and the fact that Ms. Hairston handled both is purely coincidental. *Id.* at 14:17-17. In fact, Ms. Hairston would likely have handled many hundreds if not thousands of complaints in the eighteen months between Plaintiff's complaints. Hairston Dep. 21:20-22:2.

3

Between 2009 and 2012 Plaintiff applied for and was denied at least two credit cards and one federal student loan. PNC Mot. Summ. J., Ex. A, Nadine Hatten Dep., May 14, 2013 67:16-22. However, Plaintiff was approved for other student loans and had access to other credit.[1] *Id.* 32:4-9, 49:13-50:25. Additionally, the foreclosure was not the only negative item on Plaintiff's credit report. Specifically, during the relevant time-frame, Plaintiff's credit report included a charge-off for an unpaid balance of $21,907.00. PNC Mot. Summ. J., Ex. W.

The date of foreclosure on Plaintiff's credit report was corrected after the initiation of this lawsuit.

Plaintiff alleges that she suffered headaches, emotional distress, and fights with her husband as a result of the foregoing events. Hatten Dep. 57:13-25, 81:6-83:21. No medical records have been offered, however, nor can Plaintiff name the doctor or any health professional that treated her nor can she recall details about any diagnosis or treatment for headaches or other stress related maladies. *Id.* Plaintiff states that being denied a credit card for her business caused her to have to use her personal credit cards for her law firm's expenditures and to spend extra time sorting out the business charges on her monthly statements. *Id.* at 49:1-51:19. Plaintiff, however, is unable to assign a monetary value to that time. *Id.* Indeed, Plaintiff is unable to identify any monetary damages[2] suffered as a result of PNC's failure to correct the date of foreclosure on its report to the credit agencies.

---

[1] Plaintiff is a licensed attorney, and the student loans were used to attend California Western School of Law for an L.L.M. in Trial Advocacy. The credit was needed to run her law practice.

[2] Despite being a licensed attorney with an L.L.M. in trial advocacy, Plaintiff claimed not to know what "damages" are during her deposition. Hatten Dep. 47:3-11.

4

After the conclusion of discovery proceedings, both Plaintiff and PNC filed motions for summary judgment.

## II. ANALYSIS

### A. The Standard on Motion for Summary Judgment

The Sixth Circuit recently reiterated the familiar standard for summary judgment, stating that summary judgment is proper when the movant "shows that there is no genuine dispute as to any material fact, and that the movant is entitled to judgment as a matter of law." *U.S. SEC v. Sierra Brokerage Services, Inc.*, 712 F.3d 321, 326-27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)) (quotations omitted). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* Furthermore, the "substantive law will identify which facts are material, and summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

When considering the material facts on the record, a court must bear in mind that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

### B. The Fair Credit Reporting Act

#### 1. The Fair Credit Reporting Act imposes certain duties on entities that provide information to the consumer reporting agencies

The relevant portion of the FCRA lays out detailed steps that must be taken when a "furnisher of information" is made aware of an error in the information it is furnishing.

5

When a bank, as a "furnisher of information," receives notice of a dispute with regard to the accuracy of any of the information it has provided to the credit reporting agencies, the bank must:

> (A) conduct an investigation with respect to the disputed information;
>
> (B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title;
>
> (C) report the results of the investigation to the consumer reporting agency;
>
> (D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and
>
> (E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly--
>
>> (i) modify that item of information;
>>
>> (ii) delete that item of information; or
>>
>> (iii) permanently block the reporting of that item of information.

15 U.S.C. § 1681s-2(b) (West 2013).

Plaintiff claims that PNC, as a furnisher of information under the FCRA, willfully and negligently violated its duties enumerated under § 1681s-2(b). Specifically, Plaintiff alleges that PNC, upon receipt of notice that Experian was incorrectly reporting the date of foreclosure on her credit report, failed to conduct a sufficient or reasonable investigation and review all relevant information provided by the reporting agency as required by § 1681s-2(b)(A) & (B). PNC argues that even though a mistake was made, it acted in compliance with the FCRA. As will be discussed below, the Court agrees with PNC.

### 2. The record supports multiple outcomes with regard to the FCRA's statute of limitations

As a preliminary matter, the Court must address the FCRA's built-in jurisdictional limiter. Actions for liability under the FCRA must be brought "not later than the earlier of – (1) 2 years after the date of discovery by the plaintiff of the violation that is the basis for such liability; or (2) 5 years after the date on which the violation that is the basis for such liability occurs." 15 U.S.C. § 1681p (West 2013).

The parties disagree on whether the language of 15 U.S.C. § 1681p acts to bar Plaintiff's action. PNC argues that because Plaintiff initially discovered the discrepancy on her credit report in 2009, but did not initiate this lawsuit until 2012, more than two years have passed and the action is therefore time barred by § 1681p(1). Plaintiff, on the other hand, argues that the ongoing violations triggered by her repeated attempts at resolving the issue tolled the FCRA's statute of limitation, and that as such, the action was timely filed.

The Sixth Circuit has not addressed Plaintiff's argument regarding tolling, and the only other court in the district to consider such an argument has rejected it, citing concerns of creating "[a]perpetual statute of limitations not intended by the FCRA." *Hancock v. Charter One Mortg.*, 2008 U.S. Dist. LEXIS 42828 ( E.D. Mich. 2008). While the situation is problematic, this Court agrees with the reasoning in *Hancock.* Particularly where, as in this case, the underlying complaint relates to recurring violations stemming from the same original incident, and the alleged violations are triggered every time Plaintiff files a dispute, Plaintiff would be able to extend the statute of limitations indefinitely simply by filing subsequent complaints as the two year period nears its end.

That being said, there are three readings of the undisputed facts before the Court: one leading to a conclusion that the case is time-barred, and the others to the opposite conclusion. As discussed below, there is no dispute as to any material fact with regard to Plaintiff's claims, therefore, in the interest of thoroughness, the Court will discuss all three readings of the facts on the limitations issue, even though an outcome in favor of Plaintiff on this point only leads to a ruling in favor of PNC on the merits of the case.

The issue at hand is a narrow one. Namely, whether the discovery provision of the FCRA's statute of limitations requires actual knowledge of the alleged violation in question, or whether the traditional discovery rule's inquiry notice standard - where the statute of limitations runs from the time a plaintiff reasonably should have known of a violation - is called for. The Sixth Circuit has yet to announce a rule that would provide clear guidance on this issue.

In short, the case is not time-barred if the Court applies the "actual knowledge" standard because, arguably, Plaintiff did not actually know that there was an issue with PNC's investigation until she filed her dispute in January 2011; all she actually knew was that Experian was continuing to incorrectly report information, despite the fact that PNC/National City sent the correct information in 2009. Alternatively, the case is time-barred if the Court applies the traditional discovery rule because Plaintiff reasonably should have known in July of 2009 that something went wrong with PNC/National City's attempt to communicate the correct foreclosure date to Experian, and July 2009 is more than two years before the filing of this lawsuit. Finally, an alternative application of the traditional discovery rule results in a timely filed lawsuit because, arguably, Plaintiff's inquiry notice

8

as it relates to PNC was held at bay by the 2009 letter from National City, and would not have been triggered until her 2011 dispute was filed.

These readings require applying different definitions to the word "discovery" in the FCRA. The FCRA does not define the word "discovery," nor has the Sixth Circuit weighed in on this issue. In the only case the Court was able to find exactly on point, the Second Circuit assumed without deciding that an "actual knowledge" standard applies. *Trans Union LLC v. Lindor,* 393 Fed.Appx. 786, 788 (2d Cir. 2010).

The phrase "after the date of discovery by the plaintiff of the violation" found in § 1681p is a common statutory formulation, and the Supreme Court recently gave a similar term - "after the discovery of the facts constituting the violation" - a full analysis in *Merck & Co., Inc. v. Reynolds.* 559 U.S. 633, 644-648 (2010).[3] *Merck* is a securities fraud case, but nevertheless, the Court's discussion of the statute of limitations is enlightening.

> We recognize that one might read the statutory words "after the discovery of the facts constituting the violation" as referring to the time a plaintiff actually discovered the relevant facts. But in the statute of limitations context, the word "discovery" is often used as a term of art in connection with the "discovery rule," a doctrine that delays accrual of a cause of action until the plaintiff has "discovered" it."

*Id.* The *Merck* court went on to discuss the importance of such a rule in the fraud context and then, in the following passage, discussed the use of the rule beyond the confines of fraud cases:

---

[3] There is a difference between the terms "discovery...of the violation" and "discovery of the facts constituting the violation" and in some cases that difference may be pivotal, however, here, discovery of the alleged violation, namely a failure to investigate, and the facts constituting the violation, *i.e.* PNC's alleged failure to investigate, are one and the same.

9

> More recently, both state and federal courts have applied forms of the "discovery rule" to claims other than fraud. Legislatures have codified the discovery rule in various contexts. In doing so, legislators have written the word "discovery" directly into the statute. And when they have done so, state and federal courts have typically interpreted the word to refer not only to actual discovery, but also to the hypothetical discovery of facts a reasonably diligent plaintiff would know.
>
> Thus, treatise writers now describe "the discovery rule" as allowing a claim "to accrue when the litigant first knows or with due diligence should know facts that will form the basis for an action."

*Id.* The Supreme Court then refocused its discussion on the specifics of the *Merck* case, but in doing so, noted that "[w]e normally assume that, when Congress enacts statutes, it is aware of relevant judicial precedent." *Id.*

It is important to note that the FCRA was amended in 2003, including § 1681p. Prior to the 2003 amendment, § 1681p had been the subject of a Supreme Court case, *TRW Inc. v. Andrews*, 534 U.S. 19 (2001). In *TRW*, because the pre-amendment version of § 1681p had a separate portion that explicitly applied the discovery rule in certain instances, the Court refused to extend the discovery rule to the other parts of the section. *TRW*, 534 U.S. at 29. The 2003 amendment condensed the section and potentially applied the traditional discovery rule to all FCRA claims. The amended FCRA, however, does not specifically define "discovery," leaving up for debate whether an actual knowledge standard was intended, or whether the more restrictive inquiry notice standard outlined above in *Merck* applies. Given the *Merck* court's reference to legislative intent, in deciding whether it is appropriate to apply the Supreme Court's *Merck* analysis to the FCRA it is useful to refer to the legislative history. Specifically, in summarizing the provisions of the 2003 amendments to the FCRA on the floor of the House of Representatives, the authors of the amendments said of the statute of limitations revision:

> [t]his section extends the statute of limitations for violations of the Fair Credit Reporting Act. The section requires claims to be brought within 2 years of the discovery of the violation (instead of the original standard of 2 years after the date on which the violation occurred), but with an outside restriction that all claims must be brought within 5 years of when the violation occurred.

149 Cong. Rec. E2512-02, E2514, (daily ed. Nov. 21, 2003) (Speech of Hon. Michael G. Oxley of Ohio), 2003 WL 22900844.

Congressman Oxley's statement runs counter to the application of an inquiry notice standard, as suggested by *Merck*. In other words, if the idea behind the 2003 amendments was to extend the statute of limitations in the overall spirit of the FCRA's purpose, which is ostensibly consumer protection, but to keep it within the outside five year maximum, then the best way to do that is to apply an actual knowledge standard, because that maximizes the potential time lines for consumers in a given scenario.

On the other hand, *Merck's* assertion that Congress legislates with knowledge of relevant precedent suggests that the 2003 amendment was meant to apply the traditional discovery rule, including its "with due diligence should have known" standard. What follows is a brief application of the competing theories to the facts.

On or about July 28, 2009, one month after National City investigated Plaintiff's dispute and promised to send the correct information to the consumer reporting agencies, Plaintiff received a credit report with the date of her foreclosure still incorrect. She did not file another complaint at that time. Plaintiff again received an erroneous credit report in August 2010, and again did nothing. In January 2011, Plaintiff filed a dispute with Experian regarding the foreclosure date error, prompting Experian to notify PNC. PNC then conducted an investigation, came to an incorrect conclusion, and reported back to

11

Experian. After several more attempts to resolve the matter, Plaintiff filed this lawsuit on May 22, 2012.

### a. Actual Knowledge

If one applies an actual knowledge standard to the facts outlined above, the result is a determination that the lawsuit was timely filed. That is, Plaintiff would only have had anything close to approaching actual knowledge of PNC's failure to investigate her claim after submitting her January 2011 dispute to Experian. Prior to 2011, Plaintiff's only actual knowledge of the bank's activity was that in 2009 the bank conducted a successful investigation and sent her a letter about it. Between 2009 and 2011, Plaintiff only actually knew that Experian was continuing to incorrectly report her information, despite the letter from the bank assuring her that Experian was sent the correct information. As 2011 is within the two year window, an actual knowledge standard yields a timely action.

### b. Traditional Discovery Rule

An application of the traditional discovery rule to the above facts results in two possible outcomes. Under this framework, the action was timely filed if one is convinced that the bank did not violate the FCRA in 2009, and therefore, there was no violation on the bank's part for Plaintiff to have been on notice about. The 2009 letter from National City can be used to support this proposition, as it is reasonable to rely on an assurance from a bank that they will correct an error.

On the other hand, the 2009 letter can be used to support the proposition that while the bank conducted an investigation, it did not effectively communicate the results of that investigation as required by 15 U.S.C. § 1681s-2(b)(C). Under this reading, a reasonable person would likely have suspected that there was something wrong when, one month after

receiving the bank's letter, Experian was still reporting incorrectly. As such, Plaintiff's claim would be time-barred, because she would have been on inquiry notice as of July 2009, more than two years prior to the filing of this lawsuit.

As noted above, though this case may be time-barred, in light of the multiple potential outcomes on the statute of limitations issue, the Court will decide this matter on other grounds. An analysis of the substantive FCRA claims follows.

### 3. The evidence before the Court does not support a claim for willful violation of the Fair Credit Reporting Act

Under the general rule that absent statutory language to the contrary, undefined common law terms in statutes are given their common law meaning, the Supreme Court has held that a willful violation of the FCRA includes both knowing violations of the statute and actions by the furnisher in reckless disregard of its obligations under the law. *Safeco Ins. Co. of America v. Burr,* 551 U.S. 47, 56-57 (2007).

Plaintiff concedes that she has uncovered no evidence suggesting an intentional violation of the FCRA by PNC, which leaves recklessness as the only way to reach her claim of a willful FCRA violation. The *Safeco* court, noted that "the term recklessness is not self-defining, the common law has generally understood it in the sphere of civil liability as conduct violating an objective standard: action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.* at 68 (internal quotations and citations omitted). Relying on the common law's general understanding of recklessness, the Supreme Court went on to conclude that:

> a company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless.

*Id.* at 69.

Plaintiff argues that *Safeco* stands for the principle that a willful FCRA violation includes "reckless disregard for one's rights." Pl.'s Mot. Summ. J. at 14. It should be noted, however, that the FCRA creates, germane to this case, obligations for furnishers of information as opposed to individual rights to services. While the distinction between the "obligations" of one party and the "rights" of another under a given statutory scheme may often be semantic, here the distinction aides in focusing the analysis on the relevant facts. To wit, in reviewing the FCRA, *Safeco* says nothing about "rights," rather it makes clear that a reckless disregard of one's *obligations* will qualify as a violation of the FCRA.

Viewing the evidence in a light most favorable to Plaintiff, through the lens of the *Safeco* standard, it cannot be said that PNC acted recklessly with regard to its FCRA investigation obligations. Specifically, the evidence shows that PNC has policies in place to ensure that it complies with the FCRA's investigation requirements, and that, despite reaching the wrong conclusion, PNC complied with the FCRA in this case. PNC has a team of staff members who handle FCRA complaints and have access to the company's archival records for the purposes of conducting investigations pursuant to the obligations created by 15 U.S.C. § 1681s-2(b).

Whether or not Mr. Hairston's investigation was reasonable under the circumstances, a finding of recklessness under the *Safeco* standard is precluded by the existence of the department in which Ms. Hairston works because by having that department, PNC is not, as a matter of law, "[running] a risk of violating the law substantially greater than the risk associated with a reading that was merely careless."

*Safeco*, 551 U.S. 69. One can concoct any number of hypothetical situations wherein a furnisher of information under the FCRA is acting with such careless abandon vis-à-vis its investigatory obligations that it can be deemed reckless, but having a whole department of employees who regularly conduct FCRA investigations does not qualify for that particular hypothetical set.

Furthermore, PNC cannot be faulted for relying on ACVD notices from Experian that did not indicate that Plaintiff's complaints - *which were separated by more than a year* - were actually related to the same, ongoing problem and may have warranted a more thorough investigation than the ususal complaint.

Therefore, the Court GRANTS PNC's motion for summary judgment as to Count II of the Complaint, DENIES Plaintiff's motion for summary judgment, and hereby DISMISSES Count II and any and all of Plaintiff's claims of a willful violation of the FCRA.

### 4. The evidence before the Court does not satisfy the essential elements of a claim for negligent violation of the Fair Credit Reporting Act

In addition to its provisions for willful violations, the FCRA allows recovery for negligent violations. Specifically, 15 U.S.C. § 1681o(a) provides that:

> Any person who is negligent in failing to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of--
>
> (1) any actual damages sustained by the consumer as a result of the failure; and
>
> (2) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

By its own terms, § 1681o presupposes three things, namely: 1- a violation of the FCRA; 2- actual damages sustained by the plaintiff; and 3- a causative link between the two.

As established above, PNC did not willfully or recklessly violate its duties under the FCRA. Whether or not PNC's actions amount to a negligent failure to comply with the FCRA, Plaintiff has failed to adduce any evidence of substance relating to either damages or causation, and has therefore failed to establish, as a matter of law, a claim for negligent violation of the FCRA.

Specifically with regard to damages, Plaintiff points to two sources: first, she states that she was denied a student loan and two credit cards, and; second, she claims emotional suffering, headaches, and fights with her husband as a result of the aforementioned denials of credit. During her deposition, when questioned about monetary damages, Plaintiff claimed not to understand the questions, despite being a licensed attorney. As the deposition progressed, Plaintiff's description of her alleged damages were at best conclusory and at worst incoherent. In particular, Plaintiff claims that she was having headaches from the stress of not qualifying for a student loan. However, it is uncontested that Plaintiff was able to secure sufficient funding to pursue her L.L.M. from other lenders. Additionally, Plaintiff claims that she was unable to get a credit card, but it is also uncontested that she had, at the relevant time, several credit cards.

Plaintiff's claims of damages flowing from emotional distress are purely conclusory. She has offered no medical testimony, nor was she able to relate even the most cursory description of any medical diagnosis she may have received, beyond simply, and vaguely, alleging headaches, crying spells, and disagreements with her husband roughly around the

time that she was denied a student loan and credit card. However, Plaintiff had access to credit cards and student loans and admitted that she was able to accomplish her goals despite these denials.

Most damaging to her claim, however, is Plaintiff's inability to establish causation. It should be borne in mind that this is not a case where a credit report reflected a foreclosure that did not happen, it is a case where the date of an actual foreclosure was incorrectly reported. Additionally, it is uncontested that Plaintiff had another adverse item on her credit report, specifically a charge-off of approximately $21,000 in unpaid debt.

Plaintiff's suggestion that the fact that she was approved for a credit card after her credit report was corrected is proof of causation is undermined by that fact that the card she was eventually approved for was a different card from the one she was denied prior to the correction. Plaintiff has provided no evidence regarding the qualification requirements for either card. Furthermore, it is also uncontested that foreclosures stay on a credit report as an adverse item for seven years, which means that at no time during Plaintiff's struggles with Experian and PNC would her foreclosure not have appeared on her report as an adverse item, regardless of the actions of PNC. No evidence has been provided that even obliquely suggests that changing the date of the foreclosure from December 2007 to June 2009 caused Plaintiff to be denied any credit. As for Plaintiff's emotional distress, it is understandable for Plaintiff to be upset about her less-than-stellar credit, however, absent evidence specifically connecting her distress to the date discrepancy on her credit report, this Court will not entertain an attempt to foist responsibility for Plaintiff's perfectly normal response to a stressful situation on what amounts to an administrative error by PNC. In short, the evidence that the reporting error, as opposed to the quality of Plaintiff's credit

17

notwithstanding the error, was the cause of any of her alleged damages amounts to a "scintilla of evidence in support of" Plaintiff's position, if that, and therefore is insufficient to withstand PNC's motion for summary judgment.

As Plaintiff has failed as a matter of law to establish the necessary elements of a claim for negligent violation of the Fair Credit Reporting Act, the Court GRANTS PNC's motion for summary judgment as to Count I of the Complaint, and hereby DENIES Plaintiff's motion for summary judgment and DISMISSES Count I and any and all of Plaintiff's claims of a negligent violation of the FCRA.

### III. CONCLUSION

For the reasons stated above, and because, in a light most favorable to her, Plaintiff has failed, as a matter of law, to show that a genuine dispute exists as to a material fact with regard to both her claims for willful violation and negligent violation of the Fair Credit Reporting Act, the Court hereby GRANTS PNC's motion for summary judgment, DENIES Plaintiff's motion for summary judgment, and DISMISSES Plaintiff's complaint, and any and all claims found therein.

        s/Nancy G. Edmunds  
        Nancy G. Edmunds  
        United States District Judge

Dated: September 12, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 12, 2013, by electronic and/or ordinary mail.

        s/Johnetta M. Curry-Williams  
        Case Manager  
        Acting in the Absence of Carol A. Hemeyer